Receipt number AUSFCC-11485811

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **HICKAM COMMUNITIES LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 26-1427 C** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**COMPLAINT**

The Plaintiff, Hickam Communities LLC ("Hickam Communities" or "Plaintiff") complains of the Defendant herein as follows:

**NATURE OF THE CASE**

1. Hickam Communities brings this lawsuit to recover damages caused by the United States Department of Navy's breach of its obligation to provide potable water to Hickam Communities and to reimburse Hickam Communities for damages caused by the Navy's "willful negligence."

2. This is a breach of contract action, pursuant to the Tucker Act, arising under Contract No. N62478-10-S-0077 (the "Utilities Agreement"), a Utility Sales Agreement between Hickam Communities LLC and the Naval Facilities Engineering Command, Hawaii ("NAVFAC"), pursuant to which NAVFAC agreed to provide electricity, potable water, and wastewater utility services to Hickam Communities' military family housing facilities at Joint Base Pearl Harbor-Hickam ("JBPHH"), Hawaii.

3. NAVFAC's water service under the Utilities Agreement is supplied from the Red Hill drinking water well operated by NAVFAC. In late November 2021, a petroleum release from the Navy's Red Hill Bulk Fuel Storage Facility contaminated the JBPHH drinking water supply.

4. This action seeks damages incurred by Hickam Communities as a direct and proximate result of the Government's breach of contract and willful acts of negligence in operating the Red Hill facility and contaminating the potable water supply furnished to Hickam Communities under the Utilities Agreement.

5. The damages sought consist of: (1) legal fees and costs incurred in defending, and amounts paid to settle, claims, lawsuits, and arbitration demands brought by current and former residents arising from the contamination; (2) costs incurred to clean and flush water lines affected by the contamination; and (3) costs associated with waiving early termination fees for residents who terminated their leases as a result of the contamination.

## JURISDICTION

6. This Court has jurisdiction over Hickam Communities' claim for money damages arising from the United States' breach of an express contract pursuant to 28 U.S.C. § 1491(a)(1).

7. This action is timely filed because Hickam Communities commenced this action within six years of the claim's accrual, as required by 28 U.S.C. § 2501.

## PARTIES

8. Plaintiff Hickam Communities LLC is the Purchaser under Utility Sales Agreement No. N62478-10-S-0077, with a principal address of 211 Mercury Street, Honolulu, Hawaii 96818.

9. Hickam Communities owns and operates military family housing at JBPHH pursuant to a 50-year ground lease with the United States originally executed February 1, 2005, as amended and restated most recently on July 31, 2018.

10. Defendant is the United States of America, acting through the Department of the Navy and Naval Facilities Engineering Command, Hawaii, and is the Government party to the Utilities Agreement.

## FACTS

### A. The Utilities Agreement

11. On December 27, 2011, Hickam Communities and the United States of America, acting through NAVFAC, entered into the Utilities Agreement.

12. The Utilities Agreement provides for the sale of electricity, water, and wastewater utility services (the "Utility Services") from the Government, as service supplier, to Hickam Communities, as service purchaser.

13. Pursuant to the Utilities Agreement, the Government agreed to deliver a continuous and sufficient supply of Utility Services to Hickam Communities at specified delivery points, conforming to quality standards mandated in applicable federal, state, and local regulations and statutes. The Utilities Agreement term runs from the date of signing through July 31, 2057, or until such earlier date that the Utility Services are determined to be no longer needed or the Agreement is terminated.

14. The premises covered by the Utilities Agreement are the Hickam Communities facilities at JBPHH, Hawaii, as described and depicted in Exhibit C to the Agreement, identifying Phase I and Phase II areas.

15. With respect to water service, the Delivery Point is defined as the connection between the water main owned and operated by the Government and the service lateral or other pipe or tubing pipe under six inches in diameter. The Government is responsible for the maintenance, repair, and operation of the water utility systems up to and including the Delivery Point.

16. The Utilities Agreement was entered into pursuant to Hickam Communities' long-term ground lease with the Government under which Hickam Communities owns and operates military family housing at JBPHH.

**B. The Red Hill Fuel Spill and Contamination of the JBPHH Water Supply**

17. The water service NAVFAC provides under the Utilities Agreement originates from the Red Hill drinking water well operated by NAVFAC. In late November 2021, a petroleum release from Red Hill contaminated this drinking water supply.

18. According to the U.S. Environmental Protection Agency, approximately 93,000 users of NAVFAC's water system "were impacted by the contaminated drinking water, many of whom relocated to temporary housing during the drinking water crisis." *See* "*About Red Hill Fuel Releases,*" https://www.epa.gov/red-hill/about-fuel-releases (last visited 9/24/2026). Many users impacted by the Red Hill fuel spill reside or resided in homes owned and operated by Hickam Communities.

**C. The Government's Liability Under the Utilities Agreement**

19. Paragraph 4 of the Utilities Agreement provides that the Government is responsible for damages and losses incurred by Hickam Communities arising from a willful act of negligence on the part of the Government:

> 4. The Government, its officers, agents and employees shall not be responsible for loss of or damage to property of the Purchaser or property of others, or for personal injuries to the persons arising from or incident to the furnishing of, or the failure to furnish, the service provided for hereunder, nor for any other damage or loss of profit suffered by the Purchaser arising from or incident to the furnishing of, or the failure to furnish the service provided hereunder ***unless said loss arises from a willful act of negligence on the part of the Government***. Purchaser shall hold and save Government, its officers, agents and employees harmless from any and all such

> claims or liabilities ***unless the said loss arises from a willful act of negligence on the part of the Government***.

20. Paragraph 4 of the Utilities Agreement expressly excludes from the Government's general limitation of liability any "loss aris[ing] from a willful act of negligence on the part of the Government." Because the contamination resulted from the Government's willful acts of negligence in operating the Red Hill facility, the Government is liable for the losses incurred by Hickam Communities as described herein.

21. Indeed, the Navy has already admitted to multiple instances of willful negligence—both in failing to prevent the release of petroleum into the Red Hill drinking water well and its failure to adequately respond after discovering the issue.

22. In a separate litigation against the United States, the Government expressly admitted its negligence and responsibility for the water contamination at Red Hill. Specifically, on May 10, 2023, the U.S. Department of Justice, on behalf of the Government, filed its "Joint Stipulations as to Plaintiff's Nuisance and Negligence Claims; Order" in *Feindt v. United States*, Civil No. 1:22-cv-397-LEK-KJM before the United States District Court for the District of Hawaii, in which the Government expressly conceded:

> 1. The United States does not dispute that the November 20, 2021 spill at the Red Hill Bulk Fuel Storage Facility (Red Hill) caused a nuisance for those Plaintiffs who owned or leased residences subject to the Hawaii Department of Health's November 29, 2021 advisory (hereinafter, "Resident Plaintiffs") and this nuisance lasted for as long as this advisory was in effect for each Resident Plaintiff's residence.
>
> 2. The United States does not dispute that, between May 6, 2021, and November 20, 2021, the United States breached its duty of care to the Resident Plaintiffs to exercise ordinary care in the operation of Red Hill, resulting in the May 6, 2021 and November 20, 2021 spills.

> 3. The United States does not dispute that, as a result of the aforementioned nuisance or breach, Resident Plaintiffs suffered injuries compensable under the Federal Tort Claims Act (FTCA).

23. In May 2025, the Hawaii District Court issued its "Preliminary Findings of Fact and Conclusions of Law," in which it found:

> unambiguous and credible evidence that the United States breached its duty of care; that breach of duty resulted in the release of jet fuel in the JBPHH water distribution system; humans' and animals' exposure to the chemicals in jet fuel is associated with headache, eye irritation, dizziness, neurological symptoms, and gastrointestinal issues; each of the Plaintiffs were exposed by ingesting or having skin contact with water from the JBPHH water distribution system that contained some dosage of jet fuel after the Fuel Release; and the onset of symptoms or medical conditions experienced by Plaintiffs occurred within reasonable temporality of the Fuel Release and was consistent with specific causation.
>
> [Preliminary Findings of Fact and Conclusions of Law at 16, *Feindt v. United States*, No. CV 22-00397 (D. Haw. May 7, 2025).]

24. A "Supplement to the Command Investigation into the 6 May 2021 and 20 November 2021 Incidents at Red Hill Bulk Fuel Storage Facility," dated April 15, 2022 (Supplemental Investigation), goes even further—outlining numerous examples of deliberate and unreasonable decision-making that resulted in both the spill itself and in the Navy's failure to adequately respond after learning about the spill.

25. First, with respect to Command and Control "as practiced" at Red Hill and Joint Base Pearl Harbor-Hickam (JBPHH), the Supplemental Investigation concluded that the Navy failed, *for many years*, to identify a single point of responsibility for the Red Hill site in accordance with the Navy's own regulations and instructions. Supp. Inv. at 76-79.

26. According to the Supplemental Investigation, this failure to properly assign Command responsibility was a "proximate cause of the contaminated drinking water" for at least

two reasons. On the one hand, it "resulted in a response to the November spill that was 'managed by committee' and failed to accurately communicate and address the risk to the drinking water well and surrounding environment" and a response that was "neither comprehensive nor effective." *Id.* at 76-77. More importantly, the Navy's perennial failure to assign primary responsibility for the Red Hill site "effectively reduce[d] the sense of program responsibility and agency at the installation level." *Id.* at 76. This led to the "the installation not having a tailored spill program of its own," contradictory (or non-existent) manuals and instructions, and a lack of qualified personnel with proper training, awareness, and expertise to respond in the case of an emergency. *Id.*

27. Crucially, the "lack of maintenance program management for support systems [at Red Hill] had direct and deleterious impacts on the [Automatic Aqueous Film Forming Foam (AFFF)] system, as well as other systems." *Id.* According to the Supplemental Investigation, this resulted in the AFFF waste system (which, as discussed in further detail below, was defective to a degree that should have been obvious upon acceptance) sitting "unattended and unmaintained for more than two years following acceptance [by the Navy] in July 2019." *Id*. at 78.

28. The first "operational checks of system pumps" in December and January 2022 "revealed significant and previously unknown deficiencies" with the system. *Id.* In addition, "the time lag in maintaining the system most certainly contributed to the low level of knowledge demonstrated by [Navy] personnel who were not able to effectively recognize that the system had pumped fuel and that fuel remained in the system." *Id*.

29. The Navy's failure to properly assign responsibility resulted in there being no "monthly maintenance inspections of the retention line" until July 2021, which directly led to Navy personnel being ill-equipped, uninformed, and incapable of recognizing that a spill had occurred

or effectively responding after the fact. *Id.* Moreover, the failure to properly assign Command responsibility for Red Hill was no mere oversight but was in fact directly "[c]ontrary . . . to Navy regulations and instructions [that] unambiguously identif[y] the installation Commanding Officer as the individual who is singularly responsible for all facets of an installation . . . ." *Id.* at 76.

30. A direct consequence of failing to properly assign Command responsibility for Red Hill, as the Supplemental Investigation further concluded, was that there were "no processes necessary to ensure readiness to respond to a complex spill at Red Hill"—another "proximate cause of the drinking water contamination." *Id.* at 83-84. The lack of readiness preparation continued *even after* an initial spill in May 2021 that should have put the Navy on notice as to the danger of a significant environmental catastrophe at Red Hill. According to the Supplemental Investigation:

> There is no evidence that the installation or the region had ever conducted comprehensive spill response training or even one drill to prepare for a spill at Red Hill. This lack of preparation ***even after the May spill***, highlights this failure as that event should have served as a bellwether for key leaders to take action. An effective, coordinated training and drill plan should have the elements of formal instruction, practical demonstration, formal qualification, and certification events on a periodicity matched to the complexity of the mission. Failure at Red Hill was born out of a complex casualty in an unusual environment that required a multiorganization response, but was little understood and not practiced. It is likely that had the installation or CNRH run a rigorous integrated drill program, C2 seams would have undoubtedly been identified and corrected ahead of time.
>
> [*Id.* at 84 (emphasis added).]

31. The Navy's failure to properly assign responsibility for Red Hill also resulted in a crucial shortage of relevant expertise and manpower when needed—both before and after the Red Hill spill. The Supplemental Investigation concluded that "the on-scene leadership . . . did not

appropriately engage environmental subject matter experts and therefore did not recognize the environmental risk they were assuming in making and reporting best case assumptions regarding spill containment." *Id.* at 85. The "acting CNRH Environmental Director, who had no specific environmental training, was on-scene . . . but did not contribute substantively to advising onscene leadership regarding environmental risk." *Id.*

32. The designated Fuel Department Bulk Fuel Operations Supervisor (NOSC-R) *did* have the relevant training and expertise, and the NOSC-R is normally "required to immediately take actions to ensure the installation or tenant command response is adequate for the scope of the release" whenever an oil or hazardous substance release occurs on a Navy installation. *Id.* at 67. But the CNRH Environmental Director (who had no environmental training) "inaccurately" reported "the scope and contents of the spill" to the NOSC-R and told him that he was not required at the scene. *Id.* at 85. As a consequence, the NOSC-R failed to report to the scene.

33. According to the Supplemental Investigation, however, "it was very quickly clear to the on-scene responders that the spill contained fuel." *Id.* Thus, the Supplemental Investigation concluded that "the NOSC-R should have been called to the site to advise the on-scene leaders . . . regarding environmental risk." *Id.* In fact, the "CNRH environmental program management team failed to go to the site and investigate the November spill, *even after the magnitude of the spill was obvious* during the week following the event." *Id.* (emphasis added). According to the Supplemental Investigation:

> Because it is impossible to adequately assess a spill's potential impact to the environment without being on site, the most experienced environmental subject matter experts missed a critical opportunity to observe the physical situation, question operators and responders regarding sumps, and potentially apply knowledge of the well's developmental tunnel directly below the spill to produce a

> better risk assessment that may have resulted in closure of the well before the water distribution system was contaminated.
>
> [*Id.* at 85-86.]

34. With regard to manpower, the Navy's initial investigation (the "Cavenaugh Report") concluded that the Pearl Harbor Fleet Logistic Center (FLC PH) Fuels Department was "undermanned at every level," which was an additional cause of the Red Hill catastrophe. *Id.* at 88. But the Supplemental Investigation concluded that FLC PH had only made "one formal request for one civilian FTE in the last 25 years" prior to 2022, and that there was "no evidence of a formal request for additional manning, or any substantive analysis to support such a request, had it been made." *Id.* at 87. Importantly, there was "no evidence of work to add Fuels Department manning based on increased watch standing requirements added as a corrective action from the May spill" between the May and November spills. *Id.*

35. The Supplemental Investigation also uncovered that the Navy ***deliberately elected*** to maintain PVC piping in the majority of the AFFF waste system ("a proximate cause of the November spill") ***based on cost***, and that this "approval was reached ***in spite of understanding*** that the system would be one-time use in the event that it transported fuel," and in spite of other known "risks associated with using PVC in an industrial environment, to include the risk of being struck by a heavy object as occurred in November 2021." *Id.* at 80 (emphasis added). The PVC piping had originally been installed instead of steel pipe, contrary to design and code, because of the Navy's negligent project management. *Id.*

36. To make matters worse, after deliberately electing to install an inadequate system, the Navy took no steps to educate its personnel about the system's flaws and likely failure, even though it was well-aware that the system was flawed and likely to fail. According to the

Supplemental Investigation, the resulting "lack of knowledge" amongst relevant Navy personnel contributed to the November spill because:

> If those personnel who did the checks of the AFFF waste system following the May spill had understood that the system was designed and built in such a way that up to 40,000 gallons of fluid would be retained in the system and that manual draining of the low area was required following any operation that moved fluid, it is reasonable to expect that they would have used the manual low point drains, or the installed low point drain system, to check for fuel in the piping. This lack of knowledge was exacerbated by the two years that the system sat unattended and unmaintained due to the lack of a maintenance program manager.
>
> [*Id.* at 80-81.]

37. With regard to the initial spill in May (which should have provided sufficient warning for the Navy to improve its risk management at Red Hill), the Navy's initial Cavanaugh Report identified the Navy's failure to fully account for the initially-spilled fuel as a primary cause of the November spill. *Id.* at 88. Based on the Navy's Supplemental Investigation, however, the failure to account for 20,000 gallons of missing fuel was even more pervasive and unreasonable than initially understood.

38. According to the Supplemental Investigation, there were in fact "many missed opportunities to identify or correct" the error before November. *Id*. Most egregiously, "the Deputy Officer in Charge (OIC) of the Naval Petroleum Office (NPO), the Navy's subject matter experts on bulk fuel accountability, in conducting the investigation of the May spill, understood in the course of that investigation that the installed fuel accountability system reported a loss of approximately 20,000 gallons and yet did not note that fact in his initial or final report." *Id.*

39. The commanding officer of FLC PH also understood that there was a 20,000-gallon discrepancy but decided not to "take appropriate action to address or report" the problem,

"deciding instead to accept the flawed theory that [20,000 gallons of fuel] was 'packed in the pipe.'" *Id.*

40. Indeed, there were multiple subject-matter experts who reviewed the details from the May spill. Nevertheless, the "packed in the pipe" theory was never challenged by any of the Navy's subject-matter experts even though the Navy ultimately concluded that the theory "demonstrate[d] a fundamental lack of engineering rigor and a gross misunderstanding of the installed fuel accountability system." *Id.*

41. If the Navy had properly engaged relevant experts, and if the experts it *did* engage had exhibited a reasonable amount of care and attention to the details, the extensive damages that Hickam Communities suffered as a result of the November spill would have likely been avoided.

42. In short, the Navy pervasively failed to take reasonable care at Red Hill, both before and after the November 2021 spill, to either prevent or properly respond to the spill. In several instances, the Navy and its personnel made deliberate decisions to ignore known risks that ultimately resulted in an environmental catastrophe. Based solely upon the level of negligence the Navy has already acknowledged in its own self-assessments, the Navy's actions clearly satisfy any enforceable interpretation of the "willful acts of negligence" language in the Utilities Agreement, and Hickam Communities is therefore entitled to recover all damages resulting from the spill.

43. In the alternative, the Government's contamination of the potable water supply it was obligated to deliver under the Utilities Agreement constitutes a material breach of the Agreement, independent of the liability limitation clause in Paragraph 4. The Government was expressly required to deliver a "continuous and sufficient supply of Utility Services" that "conform[s] to quality standards mandated in applicable federal, state and local regulations and

statutes." The delivery of petroleum-contaminated water failed to conform to any applicable federal, state, or local water quality standard.

**D. Resident Claims and Litigation Arising from the Contamination**

44. As a result of the contamination of the JBPHH water supply, current and former military family housing residents brought multiple claims and legal proceedings against Hickam Communities, including the following:

a. *Casey, et al. v. Ohana Military Communities, LLC, et al.*, Civil No. 1CCV-21-0001618: a putative class action complaint asserting claims against Hickam Communities (as well as against other military housing developers) related to the Red Hill water contamination filed in the Circuit Court of the First Circuit for the State of Hawaii on January 24, 2022.

b. Dispute Prevention & Resolution, Inc. (DPR), DPR No. 22-0257-M: a putative class arbitration by then-current and former residents of Hickam Communities filed on August 5, 2022.

c. *Jabour v. Hickam Communities LLC*, 1CCV-23-0001488: a putative class action by then former residents of Hickam Communities filed in the State of Hawaii Circuit Court of the First Circuit on November 17, 2023.

d. *Bentley v. Hickam Communities LLC*, 1CCV-23-0001490: a putative class action by then former residents of Hickam Communities filed in the State of Hawaii Circuit Court of the First Circuit on November 17, 2023.

45. Hickam Communities was named as a defendant in each of the actions described above solely because it owned and operated military family housing that received water furnished by the Navy under the Utilities Agreement and because that water was contaminated by petroleum

originating from the Navy's Red Hill facility. Each action arose from, and would not have been filed but for, the Navy's willful acts of negligence in operating the Red Hill facility and responding to the fuel spill. Hickam Communities played no role in causing the contamination. It nevertheless defended, and where appropriate settled, the actions in good faith and for reasonable amounts in order to mitigate the harm caused by the Navy's conduct and resulting breach of the Utility Agreement and to avoid the greater costs and risks of continued litigation and arbitration.

46. Hickam Communities' potential liability in each matter arose solely because the Navy's willful acts of negligence resulted in contamination of the water it supplied under the Utilities Agreement. Absent the Navy's breach, there would have been no contamination, no alleged injuries to residents, and no basis for any claim against Hickam Communities. The defense costs, settlement payments, and other losses incurred by Hickam Communities were therefore the direct, natural, and foreseeable result of the Navy's breach.

47. Under the Utilities Agreement, NAVFAC is responsible for these losses and damages incurred by Hickam Communities, including attorneys' fees and litigation costs. *See, e.g.*, *Kansas City Power & Light Co. v. United States*, 140 Fed. Cl. 791 (2018) (finding GSA was required to indemnify its contractor for costs associated with a workplace fatality, including attorneys' fees); *S.C. Pub. Serv. Auth.*, ASBCA No. 53701, 04-2 BCA ¶ 32,651 (June 8, 2004) (holding the Army liable under indemnity agreement for damages associated with flooding from a canal and hydropower facility, including attorneys' fees).

48. Hickam Communities maintains pollution liability insurance with Ironshore Specialty Insurance Company covering certain losses arising from the Red Hill fuel spill. Ironshore has incurred and paid defense costs, settlement payments, and other covered losses arising from resident claims, lawsuits, and arbitration demands related to the spill. Under the

policy, Hickam Communities is obligated to reimburse or account to Ironshore for amounts recovered from responsible third parties. These losses were caused by the United States' willful acts of negligence in connection with the Red Hill fuel spill and are recoverable as damages in this action.

49. Hickam Communities has incurred costs to flush water lines serving its homes that were contaminated, or reasonably believed to be contaminated, by petroleum released from the Red Hill facility.

50. Hickam Communities has incurred costs for waived early termination fees after multiple tenants elected to terminate their leases due to the potential contamination of water in Hickam Communities' homes caused by the Red Hill fuel spill.

**COUNT I - BREACH OF CONTRACT**
**(Willful Act of Negligence)**

51. Plaintiff realleges and incorporates paragraphs 1 through 50 as though set out fully herein.

52. The Utilities Agreement, No. N62478-10-S-0077, constitutes a valid and enforceable contract between Hickam Communities LLC and the United States, acting through NAVFAC.

53. Pursuant to Paragraph 4 of the Utilities Agreement, the Government's limitation on liability expressly excludes losses arising from a willful act of negligence on the part of the Government.

54. The Government committed willful acts of negligence in operating the Red Hill Bulk Fuel Storage Facility, as evidenced by, among other things, the Government's own admissions in *Feindt v. United States*, the district court's preliminary findings of fact in that

proceeding, and the Navy's own Command Investigation documenting systemic operational failures.

55. As a direct and proximate result of the Government's willful acts of negligence, the JBPHH potable water supply furnished by NAVFAC under the Utilities Agreement was contaminated with petroleum products.

56. As a direct and proximate result of the contamination, Hickam Communities has incurred damages to date in an amount to be determined at trial, including: legal fees and costs associated with defending resident claims, lawsuits, and arbitration demands; additional legal fees paid by Hickam Communities' insurer; waterline flushing costs; waived early termination fees; settlement payments by Hickam Communities; and settlement payments by Hickam Communities' insurer.

57. This Court has jurisdiction under 28 U.S.C. § 1491(a)(1) because this action seeks money damages for breach of an express contract with the United States.

58. Plaintiff is entitled to judgment in an amount to be determined at trial and such other relief as the Court deems just and proper.

**COUNT II: BREACH OF CONTRACT**
**(Failure to Deliver Conforming Utility Services)**

59. Plaintiff realleges and incorporates paragraphs 1 through 50 as though set out fully herein.

60. The Utilities Agreement, No. N62478-10-S-0077, constitutes a valid and enforceable contract between Hickam Communities LLC and the United States, acting through NAVFAC.

61. The Utilities Agreement expressly required the Government to deliver a "continuous and sufficient supply of Utility Services" that "conform[s] to quality standards mandated in applicable federal, state and local regulations and statutes."

62. By delivering petroleum-contaminated water to Hickam Communities through the JBPHH distribution system, the Government materially breached its contractual obligation to deliver potable water meeting applicable federal, state, and local water quality standards.

63. As a direct and proximate result of the Government's material breach, Hickam Communities has suffered damages in an amount to be determined at trial, as set forth above.

64. Plaintiff is entitled to judgment in an amount to be determined at trial and such other relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Hickam Communities LLC respectfully requests the Court to:

1. Enter judgment in favor of Plaintiff and against the United States in an amount to be determined at trial, for breach of Contract No. N62478-10-S-0077 arising from the Government's willful acts of negligence in contaminating the JBPHH potable water supply;

2. In the alternative, enter judgment in favor of Plaintiff and against the United States in an amount to be determined at trial, for the Government's material breach of its obligation to deliver conforming utility services under Contract No. N62478-10-S-0077; and

3. Award such other and further relief as the Court deems just and proper.

Dated: September 25, 2026.

Respectfully submitted,

*s/ Hal J. Perloff*
Hal J. Perloff
HUSCH BLACKWELL LLP
1801 Pennsylvania Avenue, NW, Suite 1000
Washington, DC 20006
(202) 378-2354 (Phone)
Hal.Perloff@huschblackwell.com

*Attorney of Record for Plaintiff*

Of Counsel:
Steven A. Neeley
Eric J. Singley
HUSCH BLACKWELL LLP